**CITY OF HOUSTON et al., Appellants,**

v.

**ALAMO BARGE LINES, INC., et al.,
Appellees.**

No. 15414.

Court of Civil Appeals of Texas.

Houston (1st Dist.).

Jan. 30, 1969.

Rehearing Denied Feb. 20, 1969.

William A. Olson, City Atty., Jerry S. Payne, Asst. City Atty., of Houston, for appellants.

Blades, Crain, Slater, Winters & Ross, James E. Ross, Gordon W. Houser, Houston, for appellees.

COLEMAN, Justice.

The City of Houston, on behalf of itself and the Houston Independent School District, brought suit against the Alamo Barge Lines, Inc. for delinquent taxes for the years 1953 through 1962, inclusive. The case was tried to the court without a jury and a "take nothing" judgment was entered. Findings of fact and conclusions of law were filed by the trial court.

Appellant introduced a delinquent tax statement showing taxes assessed against "tugs and barges" owned by Alamo Barge Lines, Inc. for the years 1953 through 1962, inclusive, by the City of Houston and the Houston Independent School District. The statement showed the tax due to the City and to the School District for each of the years listed together with the penalty and interest for each taxing district and the amount of attorney's fee claimed for each district.

Appellant also produced testimony from the President of Alamo Barge Lines, Inc., that the company's principal office was located in Houston, Texas; that the company owned certain vessels, including a tug, and that the tug was registered in Houston. The attorney representing appellant testified that the amount of attorney's fees sued for was reasonable based upon what lawyers usually charge. He estimated that the City had spent about two hundred hours on the case, and reviewed the history of the litigation.

Appellee presented the testimony of its President, Edgar A. Smith, Jr. He testified that the corporation owned the tug "Philip Arthur" until it was salvaged in 1960. It was the only tug owned by the company, which owned the barges, "Alamo 300" and "Alamo 400" during the period in question. The tug was never within the city limits of the City of Houston, although on several occasions it came up the Houston Ship Channel to the Eastern State's terminal near Manchester. In the opinion of the witness the tug "stayed more in the Nueces County District, near Corpus Christi, than any other place." It was engaged in towing

crude oil barges along the intercoastal canal of Texas, principally between the Ports of Corpus Christi and Texas City. The crew of the tug "normally" was changed "either in the Texas City, or Corpus Christi area." Repairs to the tug "were normally done in Corpus Christi, or Freeport, Texas." The witness did not think that the barges "were engaged" by any tug other than the "Philip Arthur" before it was salvaged. After that time the barges continued to operate "primarily" in the same areas. So far as the witness knows they have not been in the City of Houston since 1960. No other evidence was presented by either party.

Based on this evidence the trial court made certain findings of fact and conclusions of law. The controlling findings were that at all times material hereto the vessels owned by the appellee had a situs at a place within the Port of Corpus Christi, Nueces County, Texas, and that no valid assessments of ad valorem taxes have been made against the vessels owned by appellee since these vessels have never had a "taxable situs within the City of Houston or the Houston Independent School District."

Article 8, § 11, The Constitution of Texas, Vernon's Ann.St., provides that "all property, whether owned by persons or corporations, shall be assessed for taxation and the taxes paid in the county where situated."

The Supreme Court of Texas, in Great Southern Life Ins. Co. v. City of Austin, 112 Tex. 1, 243 S.W. 778 (1922), discussed this provision of the Constitution at great length and arrived at these general conclusions:

"It has always been the primary and fundamental rule that no sovereignty or taxing district could exercise the power of taxation, except as to property actually or constructively within its jurisdiction. This rule applies to counties and municipalities, as well as states. * * *

"*    *    *    *    *    *

"Our Constitution, therefore, in declaring that property shall be taxed *where*

*situated*, has done no more than declare the common-law rule. The purpose of the Constitution in declaring that property should be taxed in the county *where situated*, was merely to define the general jurisdictional unit for the exercise of the taxing power, and to confine the exercise of that power to the subjects of taxation within that unit. It did not define what was meant by the words 'where situated.' Since it had reference to the taxing power, it evidently meant property *where situated* for the purposes of taxation under the general principles of law as then understood. * * *

"* * * The authorities heretofore cited hold that taxes could only be imposed upon persons resident within the taxing district, or property situated therein, or business carried on, acts performed, or privileges enjoyed, within its limits. 26 R.C.L. § 234, p. 267, and other authorities, supra.

"*    *    *    *    *    *

"Under the common law, 'mobilia sequuntur personam' was a well-established maxim, and personal property of every description was taxable only at the domicile of its owner, regardless of its actual location. This is still the basic principle upon which the taxation of personal property rests. 26 R.C.L. § 241, pp. 273, 274. But even prior the Revolution the principle had been abrogated to the extent that, as between different towns and taxing districts, certain classes of tangible personal property had a taxable situs where employed in business, regardless of the domicile of its owner.

"*    *    *    *    *    *

"It is true that the actual situs of certain classes of visible and tangible personal property, as well as intangible property having similar characteristics, as, for example, money, state and municipal bonds, circulating bank notes, and shares of stock in private corporations, may have a situs for taxation where they are permanently kept, separate and apart from the domicile of the owner.

"* * * * * *

"Article 7510, Revised Statutes 1911, in its original form was section 8 of the act of 1876. It then declared, and now declares:

" 'All property, real and personal, except such as is required to be listed and assessed otherwise, shall be listed and assessed in the county *where it is situated.'*

"* * * * * *

"Article 7514, originally enacted in 1876, fixed the situs for the purposes of taxation of boats and vessels in the county where they were registered, enrolled, or licensed, or where kept, when not enrolled or licensed.

"* * * * * *

"These illustrations suffice to show that the Legislature, within a few months after the adoption of the Constitution, construed it as permitting the lawmaking power to fix the situs for purposes of taxation of intangible personal property, and in some instances of tangible personal property, at the domicile of the owner, although the property itself was actually situated in other places, or in other states.

"* * * * * *

"We have, therefore, before us legislative acts beginning within a few months after the adoption of the Constitution and extending over a period of more than 40 years, and through various codifications of the statutes, by which the Legislature has construed the constitutional provision here under consideration, and in which the Legislature has exercised the power to fix the situs for taxation of personal property at the domicile of the owner, or has assumed the authority to fix the situs of such property for taxation, regardless of the actual location of the property or the domicile of the owner. This exercise of legislative authority is entitled to great weight, and we cannot hold it without constitutional warrant unless it is plainly so beyond a reasonable doubt.

"* * * * * *

"Our attention is also directed to the cases of State v. Higgins Oil & Fuel Co. (Tex.Civ.App.) 116 S.W. 617, and City of Galveston v. J. M. Guffey Petroleum Co., 51 Tex.Civ.App. 642, 113 S.W. 585. In the last-named case the actual situs of the boats and the residence of their owners was in Jefferson county, Tex. They were therefore taxable in that county under the common law and within the terms of the Constitution. The statute involved (article 7514, Revised Statutes) must be held to apply to boats which had not otherwise obtained an actual situs. The Higgins Oil & Fuel Company Case is similar to the one just discussed.

"* * * * * *

"Since we have concluded that this constitutional provision is to be construed according to the principles of the common law, it necessarily follows that the Constitution leaves the field open for reasonable legislative action."

In Gulf, C. & S. F. Ry. Co., v. City of Dallas, 16 S.W.2d 292 (Tex.Com.App. 1929), the court followed Great Southern Life v. Austin, supra, and construed Section 5, Article 8, of the Constitution of Texas, providing that the property of railroad companies "lying or being within" the limits of a city should be subject to taxation by the city, in the same manner, holding that the words "lying and being within" were equivalent to the words "where situated", as used in Article 8, § 11, and meant where situated for the purpose of taxation under the general principles of law as then understood. The Court then said:

"* * * It therefore follows that the Legislature has plenary power to determine the situs for purposes of municipal taxation of rolling stock belonging to railroad corporations.

"* * * * * *

"The Legislature no doubt concluded that it would not be the exercise of a sound policy to subject rolling stock of a

railway company to taxation by cities and towns along their lines because of the confusion which would result from efforts of different municipalities to determine the situs of such property due to its transitory nature. While switch engines may have more permanency in their location than other rolling stock, yet all locomotives belonging to a railway company are of necessity a part of its rolling stock, the location of which is subject to be changed from time to time. The situs of so much of rolling stock belonging to railway companies was indefinite and uncertain that the Legislature was justified in classing it all as a unit for purposes of taxation. It unquestionably had the authority to determine the situs of rolling stock for purposes of municipal taxation. The fact that isolated rolling stock might in some instances appear to have a fixed location is not sufficient to invalidate the classification thus made.

"In the absence of a statute defining the taxable situs of this property otherwise, it was only taxable at the domicile of the railway company."

In City of Fort Worth v. Southland Greyhound Lines, 67 S.W.2d 354 (Tex. 1931), opinion approved City of Ft. Worth v. Southland Greyhound Lines, 123 Tex. 13, 67 S.W.2d 361 (Tex.Comm.App.1933), the court upheld the action of a district court in enjoining the city and its officers from selling a motorbus which had been levied upon to satisfy alleged delinquent taxes. In its opinion the court states that the same rule holds with reference to determining the situs for taxation purposes of the rolling stock of a motorbus company as to railroads with a principal office in the state, and vessels operating between ports. The court found that the rule generally recognized throughout the country with reference to railway cars and engines is that, unless it is otherwise provided by statute, such property has its situs for the purposes of taxation at the residence or principal office of the owner within the state. The court cites Southern Pacific Co. v. Commonwealth of Kentucky, 222 U.S. 63, 32 S.Ct. 13, 15, 56 L.Ed. 96, as stating the general rule as to situs for taxation of vessels, and quotes therefrom as follows:

" 'Since, therefore, an artificial situs for purposes of taxation is not acquired by enrolment nor by the marking of a name upon the stern, the taxable situs must be that of the domicil of the owner, since that is the situs assigned to tangibles where an actual situs has not been acquired elsewhere. The ancient maxim which assigns to tangibles, as well as intangibles, the situs of the owner for purpose of taxation, has its foundation in the protection which the owner receives from the government of his residence; and the exception to the principle is based upon the theory that if the owner, by his own act, gives to such property a permanent location elsewhere, the situs of the domicil must yield to the actual situs and resulting dominion of another government. * * *.' "

In the case cited the Supreme Court of the United States quotes from Hays v. Pacific Mail Steamship Co., 58 U.S. 596, 17 How. 596, 15 L.Ed. 254, wherein the State of California sought to tax certain ships on the theory that they had an actual situs in that state, as follows:

" 'These ships are engaged in the transportation of passengers, merchandise, etc., between the city of New York and San Francisco, by the way of Panama, and between San Francisco and different ports in the territory of Oregon. They are thus engaged in the business and commerce of the country, upon the highway of nations, touching at such ports and places as these great interests demand, and which hold out to the owners sufficient inducements by the profits realized or expected to be realized. And so far as respects the ports and harbors within the United States, they are entered and cargoes discharged or laden on board, independently of any control over them, except as it respects such municipal and sanitary regulations of the local authori-

ties as are not inconsistent with the Constitution and laws of the general government, to which belongs the regulation of commerce with foreign nations and between the states.

" 'Now, it is quite apparent that if the state of California possessed the authority to impose the tax in question, any other state in the Union, into the ports of which the vessels entered in the prosecution of their trade and business, might also impose a like tax. It may be that the course of trade or other circumstances might not occasion as great a delay in other ports on the Pacific as at the port of San Francisco. But this is a matter accidental, depending upon the amount of business to be transacted at the particular port, the nature of it; necessary repairs, etc., which in no respect can affect the question as to the situs of the property, in view of the right of taxation by the state.

" 'Besides, whether the vessel, leaving her home port for trade and commerce, visits in the course of her voyage or business, several ports, or confines her operations in the carrying trade to one, are questions that will depend upon the profitable returns of the business, and will furnish no more evidence that she has become a part of the personal property within the state, and liable to taxation at one port than at the others. She is within the jurisdiction of all or any one of them temporarily, and for a purpose wholly excluding the idea of permanently abiding in the state, or changing her home port.' "

The case of Chemical Express v. City of Roscoe, 310 S.W.2d 694 (Eastland Tex.Civ.App.1958, error ref.), was a suit by the City of Roscoe to recover against Chemical Express, a Corporation, and Chemical Transports, Inc., both of Dallas, Texas, alleged delinquent taxes on motor trucks. The case was tried by the trial court without a jury and judgment was rendered in favor of the taxing agencies. The

appellate court reversed and rendered judgment for the corporations. In its opinion the court says:

"Article 7153 of Vernon's Texas Civil Statutes provides:

" 'All property, real and personal, except such as is required to be listed and assessed otherwise, shall be listed and assessed in the county where it is situated; and all personal property, subject to taxation and temporarily removed from the State or county, shall be listed and assessed in the county of the residence of the owner thereof, or in the county where the principal office of such owner is situated.'

"The rolling stock of the defendant motor transportation corporations was not under the facts of this case subject to taxation in Nolan County where it was located and assessed for taxes on January 1, 1955, and on January 1, 1956. The situs of such personal property for taxation was in Dallas County where defendants, the owners, had their home offices and principal places of business as contemplated by Article 7153, supra; City of Fort Worth v. Southland Greyhound Lines, Tex.Civ.App., 67 S.W.2d 354; certified questions answered and opinion of Court of Civil Appeals approved, 123 Tex. 13, 67 S.W.2d 361; City of Dallas v. Gulf, Colorado & Santa Fe Ry. Co., Tex.Com.App., 16 S.W.2d 292.

"Appellees seek to distinguish the above cited cases from the facts of the instant case. They point out that the Southland Greyhound Lines and the Santa Fe Railway Company operated their rolling stock incidental to the maintenance of common carrier schedules and that such rolling stock under the terms of the statute had an artificial situs for taxation purposes at the place of domicile of the owner. Appellees urge that the defendant transportation corporations are not engaged in hauling passengers or freight on fixed routes or

schedules, but instead are contract carriers of a specific commodity, hauling one product from one point of origin to various destinations not on schedule but governed by supply and demand. The difference urged is not one which would under the terms of the statute require a different result from that reached in the cited cases. It is undisputed that the motor trucks here involved were the property of the defendant corporations whose domiciles and principal offices were in Dallas County; that such corporations were engaged in transporting property of others for hire, and operated said trucks over the western part of Texas and part of New Mexico, with terminals at Maryneal, El Paso and San Antonio, Texas; that no particular number of vehicles were assigned to any particular terminal but the assignment of the vehicles to a terminal was temporary and based upon the amount of business available. These trucks were taxed in Dallas County. These trucks of the defendant corporations, so temporarily assigned and stationed in Nolan County were not taxable in Nolan County. Their situs for the purpose of taxation was in Dallas County, the location of the domicile and principal offices of the defendant corporations."

In Greyhound Lines, Inc. v. Board of Equalization, 419 S.W.2d 345 (Tex.1967), the question for determination was whether the rolling stock of a foreign corporation was taxable in Texas, and, if so, where it should be taxed. In holding that taxes could be collected on the buses of the corporation used in Texas by the city where the corporation maintained its principal office or place of business, the court said:

"Texas has adopted the *mobilia* rule as the basic rule for locating the tax situs of tangible personal property at the domicile of the owner. That was the rule of the common law; and the provisions of Sec. 11, Art. VIII of the Constitution and of Art. 7153 requiring that property be taxed 'where situated' are but declarative of the common law, and mean where the property is situated for tax purposes under principles of common law. Great Southern Life Insurance Co. v. City of Austin, 112 Tex. 1, 243 S.W. 778 (1922). * * *

"* * * * * *

"To acquire a tax situs of its own in a particular state, it is not necessary that tangible personal property be situated in the state with absolute permanency, or that it be there situated with no intention on the part of the owner to remove it; it is enough to fix tax situs that its situation have a degree of permanency which will distinguish it from property which is in the state on a purely temporary or transitory basis. * * *

"* * * * * *

"Once the conclusion is reached that the buses have a tax situs in this State, the question of local tax situs can have only one logical answer. In the absence of legislation to the contrary, the local tax situs of rolling·stock owned by a corporation is at the place where the corporation maintains its principal office or place of business. This court has so held with respect to rolling stock of a domestic corporation, City of Ft. Worth v. Southland Greyhound Lines, 67 S.W.2d 354 (Tex.Civ.App.— Ft. Worth, 1931), certified questions answered, City of Ft. Worth v. Southland Greyhound Lines, 123 Tex. 13, 67 S.W.2d 361 (1933); Gulf, C. & S. F. Ry. Co. v. City of Dallas, 16 S.W.2d 292 (Tex.Com.App., 1929); Chemical Express v. City of Roscoe, 310 S.W.2d 694 (Tex.Civ.App.—Eastland, 1958, writ ref'd); and the rule is equally applicable to rolling stock of foreign corporations."

In State v. Crown Central Petroleum Corp., 242 S.W.2d 457 (San Antonio Tex. Civ.App.1951, error ref.), the court held that oil owned by a corporation having its

domicile and legal residence in Harris County, Texas, but produced in Nueces County, Texas, and held in storage tanks in that county when assessed for taxes, was subject to taxation by Nueces County, Texas, although the oil was in storage awaiting transportation by barge or tanker to Harris County. The court stated:

"One exception to the rule that tangible personal property is only taxable in the county of the residence of the owner is, that tangible personal property which by its character and concrete form is capable of having a value and an actual physical situs, may be taxed in the county where permanently located. State v. Fidelity & Deposit Co. of Maryland, 35 Tex.Civ.App. 214, 80 S.W. 544."

The court reasoned that the oil was a part of the general mass of property in the county, and, thus, did not have to acquire a taxable situs in the county. " * * * it had such a situs when it originated there, and that situs would continue until the oil was shipped out of the county, or at least delivered to a common carrier for that purpose."

The tax situs of airplanes was involved in City of Dallas v. Overton, 363 S.W.2d 821 (Dallas Tex.Civ.App.1963, writ ref., n. r. e.). In this case the City of Dallas attempted to tax airplanes owned by residents of the City which, when not in use, were kept, serviced and maintained at an airport located in the City of Addison. The court held that the planes had acquired a tax situs in Addison, and could not be taxed in Dallas. Referring to State v. Crown Central Petroleum Corp., supra, the court said:

"We are of the opinion that the above case, which has been approved by our Supreme Court, announces the correct rule of law applicable to the factual situation her presented. That rule of law is, as announced by Chief Justice Murray, that tangible personal property acquires a tax situs in a jurisdiction apart from its owner if it is kept there with sufficient permanency that it may fairly be regarded as being a part of the general mass of property within the jurisdiction."

The court also said:

"Obviously the courts do not construe the term 'permanent' to mean absolutely permanent, since movable property is seldom absolutely permanent. The question of whether or not the property in question is 'more or less permanent', as the term is often utilized, depends upon the factual situation in each case as illustrated by that of State v. Crown Central Petroleum Corp., Tex.Civ.App., 242 S.W.2d 457, writ ref., wherein the oil in question was stored in Nueces County awaiting removal to Harris County at some future date, but indefinite time.

"In the light of the record made by the stipulations and undisputed testimony as reviewed above, we are of the opinion that appellees' airplanes are, within the meaning of the term 'permanently' kept at Addison Airport with that degree of permanency as to make them taxable at that jurisdiction rather than in the City of Dallas where the owners reside. The planes receive their servicing and maintenance at Addison. They remain available there for their owners' business trips, and when the trips are completed they are returned to Addison. The planes are not transitory nor temporarily kept at Addison. There is no 'transient status' applicable to these airplanes at Addison. They have become a part of the 'general mass of property' within the City of Addison. Therefore, as a matter of law, appellees' planes may be said to be permanently kept at Addison Airport. If the stipulations and testimony raised any issue of fact as to whether the planes were permanently at Addison Airport, the District Court has impliedly found that they are and such finding is supported by the evidence. Renfro Drug

Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609, 23 A.L.R.2d 1114."

In City of Houston v. Western Equipment Rentals, Inc., 410 S.W.2d 805 (Waco Tex.Civ.App.1966), the court recognized that personal property is ordinarily taxable only at the domicile of the owner, but that the actual situs for taxation of "certain classes" of tangible personal property has been held to be "where they are permanently kept."

■ The tug and barges involved in this case were properly assessed in Houston, Texas, the domicile of its owner. The trial court erred in rendering a judgment for appellee since the evidence is insufficient to support the finding that the vessels have acquired a permanent location in Nueces County. This finding is the only basis on which the judgment can be supported. The evidence affirmatively shows that the vessels were not permanently located in Nueces County. City of Amarillo v. Carter, 380 S.W.2d 177 (Amarillo Tex.Civ.App. 1964); Sanford Ind. School Dist. v. H. B. Zachry Co., 393 S.W.2d 402 (Amarillo Tex.Civ.App., 1965, writ ref., n. r. e.); Alaska Freight Lines, Inc. v. King County, 66 Wash.2d 360, 402 P.2d 670 (1965); Star-Kist Foods, Inc. v. Byram, 241 Cal.App.2d 313, 50 Cal.Rptr. 381 (1966); Anno. 6 A.L.R.2d, Tax Situs of Vessels, p. 1367 et seq.

■ Appellant has conceded that the assessments for the years subsequent to 1960 are invalid because based, in part, upon the value of the tug which was scrapped during the year 1960. Judgment cannot be rendered for attorney's fees since the reasonableness of the fee charged must be determined by the trial court. City of Houston v. McCarthy, 371 S.W.2d 587 (Houston Tex.Civ.App., 1963, writ ref., n. r. e.).

The judgment of the Trial Court is reversed and the cause is remanded to the Trial Court.